## P. DOUGHERTY CO. v. UNITED STATES.
### No. 48555.

United States Court of Claims.
May 2, 1949.

Theodore B. Benson, of Washington, D. C., for plaintiff.

John R. Franklin, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

JONES, Chief Judge.

Plaintiff sues for the value of three barges which it claims it was compelled to sell by action of the Government in violation of its rights under the Fifth Amendment to the Constitution of the United States. These barges were registered under the names Allegany, Caroline, and Montgomery.

The plaintiff operated a small fleet of wooden barges which it had purchased in 1915.

In 1921 it acquired eight additional wooden barges at a cost of $90,000 each. These barges were built during the first World War to be used as schooners and were registered as schooner barges. They had a 3,800-ton coal capacity. The three barges involved in this suit were among the eight barges purchased by plaintiff in 1921. Four of the eight barges were in continuous use and needed no reconditioning; one of the remaining four was reconditioned in 1941, but the three barges involved in this suit were not reconditioned.

During 1941 plaintiff also repaired and reconditioned two ocean-going tugs which it owned and used for the purpose of hauling or towing the barges. The cost of reconditioning the barges and tugs was approximately $250,000, and as a result of this heavy expense plaintiff was financially unable to recondition the three remaining barges, which were idle and lay at anchor in the James River from about 1930. They were anchored together bow to stern, with a captain on each to care for it. They were kept painted and certain necessary repairs were made from time to time, and they were kept pumped out and afloat.

After the attack on Pearl Harbor, plaintiff's business became very heavy. Its officers planned and intended, as soon as the heavy debt above mentioned had been satisfactorily taken care of, to recondition the three barges involved in this suit, which it had been unable to do in 1941 and the early part of 1942.

The cost of reconditioning the barges at that time would have amounted to about $35,000 for each barge. It would have been necessary to have the work done in some shipyard and plaintiff had hoped to be in position to have this work done in the fall of 1942.

The War Shipping Administration in the early part of the war conducted a survey of laid-up tonnage in United States ports for the purpose of repairing and placing in commission all vessels that could be made useful for even limited service. The survey caused many vessels to be put in use, but also disclosed many ships, hulks, barges, and wrecks which were considered as having outlived their usefulness. A list was made of these vessels and the list turned over to the representative of the Salvage Division of the War Production Board with instructions to communicate with the owners of those vessels and endeavor to induce them to dispose of the vessels as scrap, unless such owners could furnish evidence that the vessels were usable in their then condition or could be reconditioned for use.

Due to the scarcity of metals, the Board was anxious to have all available materials put into use as quickly as possible. On June 5, 1942, Jack S. Ewing, regional representative of the Salvage Division, War Production Board, at Baltimore, Maryland, received from the War Shipping Administration a copy of the survey to which was attached a list of ships recommended for scrapping. The pertinent parts of the letter are set out in finding 9. It stated that because of the quantity of steel, steel plate, or engine parts needed and the required time in shipyards it was not feasible to recon-

dition these ships and urged that they be disposed of as scrap. This list included plaintiff's barges the Allegany, Caroline, and Montgomery.

There followed correspondence between Mr. Ewing and plaintiff in respect to these barges, Mr. Ewing taking the position under instructions of the War Shipping Administration to the effect that all factories, boats, idle mines and similar properties which could not be put to immediate operating use should be considered suitable for scrap purposes only, during the war emergency, and urging the pressing need for such materials; the plaintiff taking the position that the barges were valuable and that it intended to recondition them at a later date, but indicating that it could not do so at that time unless the Government would furnish the money for such reconditioning. In addition to the correspondence there were numerous conferences between Mr. Ewing and Mr. Dougherty and other officers of the plaintiff.

In an effort to have the barges involved in this suit placed in service or scrapped, Mr. Ewing attempted to secure bids from certain persons who might be interested in purchasing the barges. The Standard Steam Winch and Hoist Company, in a letter dated August 17, 1942, submitted to the War Production Board a list of the materials on the three barges covering the items it deemed usable and which the company indicated it would be willing to purchase for resale to the War Shipping Administration for vessels which it had in operation. The letter stated that "the barges themselves are, in our opinion, in very poor condition, having never been kept up and worth only the salvage value they will bring." A copy of this letter was sent to the plaintiff and plaintiff was made an offer by the company of $2,500 per barge for the metal materials in each of the three barges. The plaintiff indicated that it preferred to sell the barges outright since without the anchors, pumps and other equipment it could not have maintained and kept them afloat, and it did not want the added expense of towing them out to sea to be destroyed or to be responsible for them without the necessary equipment. It was then made an offer of $2,500 per barge for each of the barges as they then lay at anchor.

In early October 1942 an officer of the plaintiff assured Mr. Ewing that the company had agreed to dispose of the barges and that a transfer had been negotiated through the Standard Steam Winch and Hoist Company. On October 13, 1942, plaintiff executed three sealed instruments entitled "Bill of Sale of Enrolled Vessel" by the terms of which it transferred and sold the whole of each schooner barge involved in this suit, together with all tackle and equipment, to one W. L. Broaddus for whom the Standard Steam Winch and Hoist Company had been acting as agent.

The plaintiff takes the position that the threat of requisition was direct and imminent, and that the various steps taken by the Government compelled it to make disposition of the property and amounted to a taking of the property under the Fifth Amendment; that in effect the three barges were condemned and that plaintiff as a result of the survey conducted and demands made by the War Shipping Administration then and there lost all its rights in and to such barges to the Government.

While the defendant was anxious to have full use made during the war emergency of various materials and naturally brought pressure to bear to have such materials devoted to, and this no doubt influenced plaintiff in deciding to dispose of the barges for war use, we do not think that the steps taken measure up in the circumstances of this case to the elements of a requisitioning of property under the Fifth Amendment. As was stated in the case of St. Regis Paper Company v. United States, 76 F.Supp. 831, 833, 110 C.Cl. 271, 275–276, certiorari denied 335 U.S. 815, 69 S.Ct. 32:

"The United States has given consent that it be sued in certain kinds of cases, but in order to maintain a suit in this court any litigant must bring its action within the constitutional or statutory limits of that permission.

\*    \*    \*    \*    \*    \*

"* * * that there must be an actual taking of some right in the property."

In the case of Vansant v. United States, 75 Ct.Cl. 562, 566, the court said: "In order to come within the constitutional provision there must be shown to have been an exercise, by the United States, of a proprietary right for a greater or less time, in the property taken. A taking within the meaning of the amendment must have been an intentional appropriation of the property to the public use, and the appropriation must have been authorized by law [citing cases]."

The demands of the Government as set out in our findings were not sufficient to constitute duress. Hartsville Oil Mill v. United States, 271 U.S. 43, 46 S.Ct. 389, 70 L.Ed. 822. The plaintiff could have awaited requisition and claimed the value of the property taken. It chose not to do so, but rather to dispose of the property in the market. Having taken this course it may not, in the circumstances of this case, claim that its property was taken by the defendant.

Plaintiff's petition is dismissed.

HOWELL, MADDEN, WHITAKER, and LITTLETON, Judges, concur.